Can a prisoner publish a book? And here, it was clear that a prisoner may write a book. Oddly, we have statutes and rules saying that, but you can't publish one. And it's sort of like saying freedom of speech means you can, you know, talk in a closet or, you know, slip it under your pillow or something. I'm aware of no published case that says an inmate may not publish a book. And the dilemma is that you can't publish a book without economic entanglement. That is the dilemma. It's kind of like saying assume there's nothing called a market economy. And you have to assume, of course, that there is one. And publishers do contracts. They don't have a ---- Kagan. Well, that's, you know, that might have been true in the days before the Internet. All kinds of books are published without fee on the Internet and without cost and without a publisher. If I may, the publication process which was used here is kind of in this new generation of publication services. I would like the Court to know I'm very well aware that I have 17 books done. I understand. I'm just ---- I mean, that's one route. But I just am saying I don't think it's correct to say a book cannot be published without having a publisher with whom you have a financial arrangement. Well, let me say this, that if nothing else, you have to ---- I hope you would agree that that's an issue of fact, because let me assure you, you can't. And I know ---- and here's why. Let me tell you a real simple reason. Well, let me ---- I will tell you, you know, I just wanted to point this out to you. The question I have is if we'll take your premise that you do need, in effect, an economic arrangement with the publisher, the prison rule, as stated, doesn't actually relate to books. It relates to any business or professional activity, so to speak, by the prisoner. So the argument that your book doesn't fall into that is a hard one to swallow. And then we're ---- it seems to me we're left with the question of, well, is that somehow unconstitutional or poses a problem as applied to book publishing, as opposed to, say, selling herbs or some other type of situation. So what is your position on that? We do argue that writing and submitting a book for publication is not a business. The business of publishing is done by the publisher. They're the ones that manufacture the book, sell the book. They get it on Amazon. They get it on BarnesandNoble.com. They go to Ingram's, the book distributor. They do all that stuff. The inmate basically submits a manuscript, and that's his operation on it. So I realize you're thinking, well, it sounds like a business to me, but I would like the Court to look at that as perhaps a de novo issue. Is it a business to write a book? Is it a business if you write a poem? It doesn't seem like a business to me. You're not buying, selling. You're writing something, submitting it, and then somebody else ---- There's two separate things there. If I sit in my prison cell or in my bedroom and I write a poem, that's not a business, right? I'm a writer, and I'm just writing. Now, the question becomes, if you do something else with the poem or novel or manuscript, is that the business? And I'm just submitting, when you're not ---- To me, business is ---- I mean, I'm a business owner. I know you do transactions and things. You don't just sit back and let someone else do transactions. Supposing that, to follow up Judge McKeown's question, the poem was written and it was published in the New York Times, and the editor of the New York Times thought it was a grand poem, so he published it in the Times. It could happen in that situation that there was no revenue involved, right? Right. Can I ---- And there was no business involved. Can I tell you there's a case kind of ---- I don't know if you were referring to an actual case when you were giving that hypothetical, but there is a kind of case about that where that was still prohibited, that kind of arrangement was still prohibited by a prison because the prisoner submitted a byline and they didn't like that. And that's Jordan v. Pew, 504-Fed 2nd, 1109, District Court in Colorado. May I also make the Court aware that we found some new authorities, and I submitted a letter to that effect, and I gave it to counsel as well. One is Hammer v. Ashcroft, a Seventh Circuit case, actually. So, but then I noted it's 512-Fed 3rd, 961, great compendium of the law on this issue. However, en banc review was granted, so the decision was vacated. I'm wondering if this Court can review the case for its persuasive aspects, but also it does have a compendium of cases, one of which I'd like to bring to the Court. The opinion was vacated? The opinion was vacated. The decision is due soon. It was argued in September, so we expect – if nothing else, I would ask the Court to monitor that case. It appears very much on point. They're going to en banc the case. It has been granted. Argument already occurred. We're waiting for a decision. That's the status. Did your client – it's a little unclear from the record, so maybe you can clarify this. Did he at some point make a concession that he would have been happy to publish this book, but for no royalties or no financial entanglement? He – in fact, he did more than that. He gifted them away. And let me suggest this. He – unfortunately, iUniverse, the publisher, just doesn't have a no-royalty contract. They just don't do it. And nor – I've dealt with several of these. They just don't. And you can ask them, and they say, no, we pay royalty. That's our deal. And we don't do it without that. It might be a contract issue for them, you know, consideration, who knows. But they don't offer the freebie. He does offer to give them. Money. Every time I offer no royalties, they seem happy to take it. Well, I suppose. But let me – so there's two aspects. One, he did offer to say, okay, a third party could receive these. Yes. He'll gift them away. He'll gift them away. Yes. But he didn't – so, in effect, he would say, I personally would take no money. Right. He's happy – and he also said that in his book. I don't want to make money off this. He really wants to get his word out there. I want to let the Court know about that. But it's not a – I mean, I don't – he's not trying to make money here. And he won't give them away. Well, let's say that the Court below fairly determined that the book arrangement, even with the gifting, fell within the business prohibition. Are you making a claim that that prohibition is disparately applied to different situations and is not applied across the board in the same way to different types of businesses? Well, let me answer the question this way. The claim we're making is that to the extent it bans a book, book banning is illegal in the United States under the First Amendment, and no court has ever said you can ban a book. It goes under the content-neutral rules of First Amendment jurisprudence. Content-based regulations are presumptively invalid. In the Jordan v. Pugh case I showed – I talked about earlier that's in my letter. That's a district court case. And other cases talk about how if – it's a pretext issue. Is it really because it's a business? Is that really why they're banning it? Or is it because, as stated in the June 21, 2005 memo, which is at Clerk's Transcript 2425, signed by the various correctional officials, including the warden, the book is filled with a number of inaccuracies. And he basically – they're saying Mr. Bretsch's discussion of this whole presicanerial dog operation is not truthful. That's content-neutral. Maybe you're saying it a different way. My question was directed to that. In other words, if regulation is legitimate, as it has been in some cases, to have a business ban, then what you're saying is that this business ban is not content-neutral as applied. Is that correct? As applied. As applied. As applied. And it certainly could be done, I'm sure, in a content-neutral way. I would even like to say, though, I just would love to see a rule that says you cannot ban a book in this country. I mean, I hope you have an imagination of us, like, burning all copies of them. I mean, what kind of rule is that? And this Court would be the first to author that kind of odd decision. It's kind of a harrowing ground. That's a slippery slope. But as applied here, they actually gave content-specific reasons for banning the book in their memo. Wasn't that an additional reason? It is in addition, yes. Right. So there are really two reasons. There's the business aspect and the content aspect. Yes. I would agree with your assumption. But if this Court were to rule that the business requirement is valid and content-neutral, would we have to reach the other ground? Here's the issue of fact. Is it for real or is it pretextual? When they say it's a business, we submit they're full of it. And it's a lie and it's deceptive and it's dishonest. The real reason, let me assure you, if the truth ever got out, is the warden does not like what is in that book. It says that the prison guards knew all about this Presa Canaria operation, that it was not a secret, it was not illegal, that all the things stated in the press were actually false. It goes on and on like that. They don't like the content. So here's what I'm saying. If the real reason is the content, that's it right there. They lose. And they... Counsel, I'd like you to turn your attention to the banning of the book coming back into the prison. Okay. The book was deemed contraband in this June 2105 memo I was just reading from. And thus, it's banned from prison. And we look at, there's two issues here. We want it, obviously, to come into the prison. We, you know, we want it not to be contraband. It's, right now, it's an illegal book, and we want it to be deemed legal. We do agree, and we did agree, that we would make any changes editorial-wise as far as if something was unduly insulting, we do not want to insult anyone, and we did offer that. So it's not like a, no, it's got to be this way, there's no other way. We're willing to mollify it. And we did do that, by the way. We came out with a second edition that takes out some of the, let's say, adjectives, without hopefully losing Mr. Bretsch's points. So we submit that the banning, there's two real problems here. It's banned from the prison, but because of the business regulation rule, he can't publish it, period. So if he does, we actually stop the publication, I'd like you to be aware. It's been stopped by, through the publisher at my request. And if this court overrules it, I would love to, you know, get it started again. But we want to both be able to bring it into the prison, you know, as a regular book, and. And distribute it to other people in the prison. Anyone who wants to buy it. Anybody who wants to read it, guides or other inmates or residents, as we call them. Yeah, free people even. Free people. You never know, they might, a free human might. He can't have it in his cell now even, correct? He is allowed to have a manuscript in his cell. But I don't think he's allowed to have a published book. In fact, the way this came about, he was sending the manuscript to me, and when I, the book was all done done, I sent him two copies of the book. And that's when one of the correctional sergeants picked it up and said, uh-oh. And did his memo, and then it got banned at the warden level, and then it got banned at the director level. Mr. Breches commenced on the, what's called the 602 process, which is the administrative review process. Did all three levels, and he was turned down. He went to federal court, got thrown out right away. And by the way, I hope you'll agree, this is subject to de novo review here today. This kind of process here. Let's hear from the Attorney General, unless, did you have another question? I have one more question. Is it legitimate for the prison authorities to read a book and say, this is going to cause fights in the prison, this is going to cause penological problems, and to ban it on that basis? Yes, and I would say yes. I would agree with you on that, that the, the ban, the- I didn't, I asked a question. I didn't ask you to agree or disagree. Oh, I was answering it, yes. A state may limit expression based on content only if the state has a compelling interest and chooses the least restrictive means to further the articulated interest. Sable Communications versus Cal Inc, 492 US 115, cited at page 48 of our brief. Here, I would just point out that the, any kind of insulting language that was in the book, he offered to remove. And so that was the issue, and we don't think that was the issue, because when that was offered up, they didn't take us up on it. We went ahead and did it, though, I would like you to know. All right. We'll hear from the Attorney General. Very well. Thank you. Can you please support? I'm District Attorney, Deputy, Deputy Attorney General Emily Brinkman, and I'm here on behalf of the defendant today. Despite what Mr. Bretches argues, this case is not about the First Amendment right of an inmate to write and then publish a book. Rather, this is about an inmate's right to conduct a business from prison, which generates revenue. I'd like to bring the court's attention to two points today. First, that the regulations prohibiting inmates from conducting a business while in prison are constitutional and do not violate the First Amendment. Second, the second point I'd like to bring out is that the court, the district court was permitted to screen out this complaint under the Prison Litigation Reform Act and 28 U.S.C. Section 1915a because courts have to determine whether prisoners state cognizable claims. I bring this up because the Mr. Bretches has argued that the court acted beyond its authority when it conducted its screening. Counsel, clearly he could write the book.  Isn't that correct? He could write the book. Now, he could mail it out of the prison to a publisher. Yes, which he did. And it's only because royalties were going to be charged that it becomes a business? It's not just the royalties, Your Honor. What happened in this case is that Mr. Bretches entered into a business contract with iUniverse, a publishing company, for them to publish copies of his manuscript, which would then be sold, and then royalties are paid to Mr. Bretches. And that act of entering into the contract, as well as the revenue-generating activity. If the contract provided for no payment to him but, say, to a certain charity for dogs, would that be okay? Well, Your Honor, as the record reflects, a yes or no on that, please. I don't think it's that simple, unfortunately, though. Because what we have here is iUniverse specifically said they have to pay Mr. Bretches. They can't provide this royalty to a charity, such as a dog rescue organization. They can't do that. So that's beyond what the court has before it. I would assert, though. Well, this is hypothetical, and I'm just kind of trying to narrow it down. The only problem, apparently, is that he's going to get royalties. Well, that he entered into the contract, which also occurs royalties. Had he not entered into a contract, had he just given the book away and then somebody else published it, we might be in a different place before the court. He sent it to a law review, and they usually require you to sign some kind of contract, but you don't get any money for it. Would that be a business deal that he'd be prohibited from? They're going to publish his article in their law review. It might be, Your Honor. Well, what do you mean it might be? It is or it isn't? It depends upon the nature of that contract. So what do you need to have it be a business deal? Well, 3024, which is the regulation at issue, says that inmates are prohibited without permission of the warden or the institution head to enter into a business which generates a revenue or profit. So ‑‑ Okay. So I said that he sends it to a law review, no royalty, they're just going to publish it for him, and he doesn't get any money. So that wouldn't be a business then under your definition? Most likely not. However, again, in this case, Mr. Brechus isn't prohibited from entering into a publishing deal. So he ‑‑ period. He has to ‑‑ first he has to seek permission of the warden, which he didn't do until after the fact. And if that activity generates revenue, again, he's in violation. So ‑‑ Does it have to generate revenue for him? I believe it does. I believe if the activity generates revenue, so even if he enters in a contract and there's revenue generated that says, okay, it's going to be sent out to a third party, what then has to happen is the prison officials still have to ensure that this third party isn't then funneling money back to Mr. Brechus. They're still having to engage extra prison administration to watch his trust accounts and monitor the activity. The crux of it really is generating revenue, not the payment of royalties to Mr. Brechus. Is that what you're saying? Yes. That's the crux of it. Okay. Now, what is your explanation for why it's necessary to be so restrictive in that regard? Well, courts have held not just ‑‑ the Ninth Circuit has held as well as the First, the Eleventh, and the Eighth Circuit have all held that prisoners do not have a fundamental right, a First Amendment right, to run a business from prison because of several effects that it has on the prison officials. One, you require more prison administration to assist that inmate in running a business so that you have to monitor trust accounts, you have to make sure that the business that they're entering to is legal as well. You also have concerns that that inmate becomes, as the district court correctly noted, the big wheel. So whether they become influential within the prison, they become celebrities in their own right, or they become targets by other inmates who say, oh, this inmate, one, has become famous, two, this inmate's got money, I want to do something about that. So you have all these ‑‑ Those are two separate things. If he could publish this book on the Internet, self-publish, in effect, with no revenues to him, would that be a problem? It may create additional problems, Your Honor, that are above and beyond what 3024 also sets out. And the reasoning behind ‑‑ I'm asking you ‑‑ see, the difficulty is that you have a moving target for what he can and can't do with his book. If he publishes on the Internet and he doesn't get any revenue, then we don't have a problem about him getting money. That goes away, correct? If it's not generating activity. Right. You say that as long as it generates revenue, it's in violation. Whether he gets the revenue or not is not the issue. It's whether it generates revenue. Correct. That's your position. Correct. So if it didn't generate revenue, then your position was, but he might get too famous. Well, it's not just that part of the business rule, or is that another rule you're now invoking? Well, that's one of the reasons why courts ‑‑ one of the many reasons that courts have upheld these prison ‑‑ That's the penalogical reason for the underpinnings of the rule. Correct. Was, you know, not just that, you know, the big wheel that he becomes a famous person, but the entanglement that the prison administration has with this inmate conducting this business. Do you agree ‑‑ do you agree, excuse me for interrupting, but time is running. Do you agree with counsel's statement that there's no way he could have gone out and published this book without having to have a revenue‑generating, quote, royalty payment returned to him? Do you believe ‑‑ do you agree with that? That the world at large doesn't arrange for what he wants to do? I find that hard to believe, Your Honor, but the facts, what we have before us, we have a limited record, and it does show that Breches did enter into this agreement. Whether there are other processes out there in the world for him to get his manuscript out there and out to the world without getting any money back. Under the Turner case, though, we have to take a look and see if there are less restrictive means, don't we? Yes. And what would the less restrictive means be in this case, in your opinion? He continued to ‑‑ he can continue to communicate with outside people about his thoughts and opinions related to the dog war business, the dog mauling case. He has the right to continue communicating with people outside of the prison. What occurred in this case, though, is that, again, that revenue‑generating activity that he entered into with iUniverse. His other argument is, well, you have this rule and you call it a business rule, but in this case, because of the memos in the file, the reason you're invoking the business rule is because you don't like what's inside my book. So it's a ‑‑ you have taken a facially neutral restriction and transformed it into a content‑based restriction. What is your response to that? Well, when the first ‑‑ when the book first came into the prison, it was on ‑‑ it came in on approximately June 17th of 2005. The book was immediately deemed to be a business from prison. And Mr. Bretsch's was immediately written a rule violation report for conducting a business from prison. Only after the fact, after the book was finally read, was it deemed to be contraband under regulation 3006. So I think that argument that Mr. Bretsch's makes is not quite accurate because the book was originally excluded because of the business aspect. Counsel, we have kind of a well‑known case of Tukey Williams writing books to show that being a gang member is a bad thing to do. And this was written in prison, sent out, published. Now, is this rule enforced only against books that the prison doesn't like? Your Honor, I would assert no, it's not. I am not that familiar with the background surrounding Mr. Williams getting his books published either. I don't know what assistance you have. Well, you know he was in prison awaiting the execution from the death penalty. You know that he sent the books out. They were published and well received. And the prison was very appreciative. We know that much. I do, Your Honor. But what I also don't know is, you know, how he entered into those arrangements to get those books published. I don't know any of those facts underlying that process that Mr. Williams engaged in. What I do know is what was before this Court, which is that we have a book. It's been published. It's for sale for $1895. And we have a contract with iUniverse between Mr. Bretsch's and iUniverse. So with that, thank you. Thank you. No. Thank you. Thank you. We appreciate argument from both counsel. Very interesting case. Bretsch's v. Kirkland is submitted.
judges: Fletcher, McKeown, Hart